# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Virdie Allen, Charles and Eileen Agee,
and Hilman and Erma Raynes,
Plaintiffs Below, Petitioners**

**FILED**

November 22, 2013
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 13-0418** (Putnam County 04-C-465)

**Monsanto Company and Pharmacia Corporation,
Defendants Below, Respondents,
Zina G. Bibb, Vikki Bailey, Herbert W. Dixon,
Norma J. Dixon, Donald R. Rhodes, Wanda M.
Rhodes, Betty Tyson, and Charles S. Tyson, et al.,
Plaintiffs Below, Respondents**

## MEMORANDUM DECISION

Petitioners Virdie Allen, Charles and Eileen Agee, and Hilman and Erma Raynes, by counsel Thomas F. Urban II, appeal the Circuit Court of Putnam County's "Order Approving Final Settlement" entered on January 25, 2013 that found the settlement in this class action to be fair, adequate, and reasonable. Respondents and defendants below Monsanto Company and Pharmacia Corporation, by counsel Charles M. Love, III, Leonard Knee, Fazal A. Shere, Floyd E. Boone, and Patrick C. Timony, filed a response supporting the approval of the settlement. Respondents and plaintiff class representatives Zina G. Bibb, Vikki Bailey, Herbert W. Dixon, Norma J. Dixon, Donald R. Rhodes, Wanda M. Rhodes, Betty Tyson, and Charles S. Tyson, by counsel W. Stuart Calwell, John H. Skaggs, David H. Carriger, Rudolph DiTrapano, Sean McGinley, and Katherine R. Snow, also filed a response supporting the approval of the settlement. Petitioners filed replies to both respondents' briefs. Petitioners, a group of plaintiffs below, object to the settlement and consequent dismissal of the case.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Facts and Relevant Procedural History[1]

---

[1]As the circuit court's order and the parties' briefs point out, this case involves more than seven years of litigation, over fifty hearings, the exchange of over one million pages of discovery, over sixty expert witness depositions, over ninety fact witness depositions, the

1

This appeal stems from the circuit court's approval of two settlement agreements[2] in the class action complaint, styled *Zina Bibb, et al. v. Monsanto, et al.,* Civil Action No. 04-C-465, filed on December 17, 2004, against Monsanto Company and Pharmacia Corporation[3] (collectively hereinafter "Monsanto") that alleged negligence, nuisance, strict liability, and trespass. Plaintiffs alleged damages as a result of Monsanto's operation of the 2,4,5-T process, which resulted in the by-product of a toxic dioxin, 2,3,7,8-TCDD.[4] Specifically, plaintiffs' allegations centered on the production of 2,4,5-T by Monsanto's corporate predecessor (referred to as "Old Monsanto") between approximately 1948 and 1969. Plaintiffs alleged that the burning of 2,4,5-T waste materials resulted in air inhalation exposure to dioxin and elevated blood serum dioxin levels to individuals in the Class Affected Area, defined as the area encompassed within a five-mile radius from the Old Monsanto chemical plant in Putnam County. Plaintiffs also alleged the burning resulted in dioxin being deposited on the ground and in houses within the Class Affected Area.

Plaintiffs sought to represent two distinct, but overlapping, classes: (1) the medical monitoring class, and (2) the property class. The complaint was signed by attorney Stuart Calwell for the Calwell Practice PLLC (hereinafter "Class Counsel") and by attorney James F. Humphreys on behalf of James F. Humphreys, LC. Below Mr. Humphrey's signature, the complaint also listed his then-associate, Thomas F. Urban II, petitioners' counsel herein.[5]

---

issuance of more than two-hundred orders, all culminating in a three-hundred eighty-six page order by the circuit court approving the settlement. Monsanto contends that this appeal can be boiled down to whether the circuit court abused its discretion in: (1) maintaining the certification of classes, and (2) finding that the settlement was fair, adequate, and reasonable.

[2]The two settlements involved are the "Medical Monitoring Class Settlement Agreement" and the "Property Class Settlement Agreement." Unless referring to one of the specific agreements, this decision will refer to the two settlements collectively as "the settlement."

[3]Monsanto Company and Pharmacia Corporation were formed in 1999, after Old Monsanto entered into an agreement with Pharmacia and Upjohn, Inc., to merge their agricultural products business and their pharmaceuticals and nutrition business. The merger eventually created two separate companies, Monsanto Company and Pharmacia Corporation. Pharmacia held the assets of the pharmaceuticals and nutrition business, while Monsanto Company held the assets of the agricultural products business.

[4]2,4,5-Trichlorophenoxyacetic ("2,4,5-T") is a herbicide that was produced at Monsanto's Nitro, West Virginia site. The production of 2,4,5-T results in the by-product 2,3,7,8-Tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD").

[5]In or around June of 2007, Mr. Urban dissociated with Mr. Humphreys and formed the law firm of Urban & Falk, located in Alexandria, Virginia. Mr. Urban filed a substitution of counsel naming himself, James Falk, and Urban & Falk as counsel for the five plaintiffs who are the named petitioners in this case. The notice was accompanied by letters from each of the five petitioners stating that they were now represented by Urban & Falk. After multiple disputes between plaintiffs' counsel, the circuit court appointed Mr. Calwell as Class Counsel and

The circuit court certified both classes on January 8, 2008, after substantial briefing and approximately six days of hearing following the initial filing for class certification in June of 2006. The court defined the medical monitoring class to comprise "[t]hose persons who have resided, worked full-time, attended school full-time, in the Class Affected Area during the period 1948 to the present."[6] The property class was defined to comprise "[c]urrent owners of real property in whole or in part with the Class Affected Area shown in Exhibit 1." Both classes are linked to the same Class Affected Area, defined by reference to a map that was developed by Class Counsel's expert in order to predict where dioxins may have been distributed by the Old Monsanto plant. On August 6, 2010, the court substantially approved the class notices and dissemination campaign presented by Class Counsel and ordered that the campaign be completed by October 19, 2010.

Certification of the property class was the subject of continued attack by Monsanto, as evidenced by its filing of at least twenty-three separate summary judgment motions. One such motion attacked the opinions of Robert J. Carr, P.E., offered by Class Counsel to prove the amount of funds potentially needed to remediate the real property encompassed within the Class Affected Area. The circuit court ultimately excluded Mr. Carr's opinions on the basis that they were: (1) based on an engineering methodology not intended to support expert opinions; (2) only based upon five to ten percent of the data needed for an accurate opinion; (3) subject to a margin of error too broad to be admissible; and (4) not sufficiently based on objective data. The exclusion of Mr. Carr's opinions deprived the property class members of the only basis upon which a jury could find for them on a class-wide basis, prompting Monsanto to request summary judgment, or in the alternative, decertification of the property class. The circuit court opted to decertify the property class.[7]

---

authorized him to "be the lead counsel who shall speak on behalf of all Plaintiffs and represent the class as a whole." Mr. Urban asserted that his firm represented an additional approximately 1,600 clients, most of whom allegedly resided in the Class Affected Area. The circuit court ultimately found this number to be unsupported by the documentation submitted at the June 18, 2012, Fairness Hearing.

[6]Monsanto challenged the court's certification order with respect to the medical monitoring class and persuaded the court to narrow the scope to exclude persons alleging exposure after 1970 based on a lack of exposure evidence after that year. However, as a result of Class Counsel's motion for reconsideration that provided additional exposure evidence, the court re-adopted the original class definition on March 26, 2010.

[7]Class Counsel appealed the decertification of the property class to this Court on December 12, 2011, along with a motion to hold the appeal in abeyance. That appeal was docketed as *Zina Bibb, et al. v Monsanto, et al.,* W.Va. Supreme Court Docket No. 11-1665. By Order entered March 2, 2012, this Court directed that the matter be held in abeyance pending further order from this Court. Given the present decision affirming the approval of the settlement and dismissal of the underlying civil action, we hereby dismiss Class Counsel's appeal, *Zina Bibb, et al. v. Monsanto, et al.,* Docket No. 11-1665, as moot.

After Monsanto's efforts to have the medical monitoring class decertified failed, the case was scheduled to proceed to trial on September 6, 2011. However, the matter was reassigned to the Honorable Derek Swope, sitting by assignment, and the trial was rescheduled for January 3, 2012. The parties participated in two mediations, the first in October of 2011, conducted by attorney Thomas Flaherty, and the second in December of 2011, conducted by the Honorable Judges Alan Moats and Booker Stephens. The mediations were not successful, and the case proceeded to trial as scheduled. However, around the time of completion of voir dire, on January 17, 2012, the parties advised the court that they reached a tentative global settlement. Importantly, as the negotiations involved the property class plaintiffs, on January 25, 2012, the court agreed to conditionally vacate its prior decertification order for the purpose of facilitating settlement.[8]

The main terms of the Medical Monitoring Class Settlement Agreement are summarized as follows: (1) creation of a fund that would provide testing for class members over a thirty-year period; (2) contribution by Monsanto of at least $3 million for each of the seven screening periods, resulting in an obligation to provide at least $21 million in funding for screening; (3) contribution by Monsanto of an additional $63 million if certain benchmarks are triggered, i.e., if more than twenty-five percent of the participants in the medical monitoring program have blood serum dioxin levels greater than the background range, provided that at least 100 participants have serum samples drawn that are capable of analysis; (4) repeated blood testing every five years for a period of thirty years, unless the triggering event occurs, in which case, every two years; and (5) medical monitoring be limited to class members who resided, attended school, or worked for minimum periods of time in a smaller area subsumed within the larger Class Affected Area, referred to as the Settlement Area.

The main terms of the Property Class Settlement Agreement are summarized as follows: (1) creation of a fund to be used to pay for cleaning the interior surfaces of living spaces within eligible residences within the Settlement Area; (2) contribution by Monsanto of $3 million per year over a three-year period, for a total contribution of $9 million; and (3) unused funds would be returned to Monsanto.

With respect to the attorney fees and costs, Class Counsel petitioned the circuit court for payment of fees in the amount of $22.5 million and costs in the amount of approximately $7 million, all payable by Monsanto from a fund separate than the funds required under the settlement. Monsanto agreed to this amount. By separate order entered contemporaneously with the order under appeal herein, the circuit court granted Class Counsel's petition for fees and expenses.[9]

---

[8]Petitioners state that they objected to the recertification of the property class without a proper hearing and opportunity to opt out of the class, but the court rejected their arguments.

[9]The court's award of fees and expenses was broken down by specific settlement and included conditions upon which payment of certain fees would be made, none of which are relevant for the determination of this appeal. In the end, the circuit court approved a total potential payment of $29.5 million in fees and expenses to Class Counsel.

The circuit court preliminarily approved the settlement and the class notification documents submitted by Class Counsel and directed that dissemination begin by April 5, 2012. The court scheduled a fairness hearing[10] for June 18, 2012.

Petitioners, through Mr. Urban, requested broad discovery about the settlement, both before and after the circuit court's preliminary approval, and the circuit court directed Class Counsel and Monsanto to respond so that it could make a proper determination as to whether the settlement was fair, adequate, and reasonable. Class Counsel and Monsanto complied. However, the circuit court denied petitioners' request for discovery relating to the mediations.

The circuit court received three categories of objections to the proposed settlement: (1) from attorney Urban on behalf of the five named petitioners herein, as well as on behalf of approximately 1,600 class members he purported to represent; (2) from attorney Ruth McQuade who represented three purported class members;[11] and (3) forty-four objections from individual class members. In addition to receiving voluminous briefing by the parties, the court heard from Monsanto, Class Counsel on behalf of the classes, Mr. Urban, Ms. McQuade, several objecting class members, and proposed settlement administrator, attorney Thomas Flaherty, at the June 18, 2012, Fairness Hearing.

---

[10]Rule 23(e) of the West Virginia Rules of Civil Procedure provides that a class action "shall not be dismissed or compromised without the approval of the court." *See also Bd. of Educ. of County of Monongalia v. Starcher,* 176 W.Va. 388, 343 S.E.2d 673 (1986). While the fairness hearing is not expressly required by Rule 23 of the West Virginia Rules of Civil Procedure, the circuit court found such a requirement to be "universally accepted," stating

> The fairness hearing is critical because it is the point at which the [proposed settlement] is put to a public test, where the judiciary lends its moral force to the deal. Given that so much rides on the fairness hearing, it remains a relatively underdeveloped and undertheorized aspect of civil adjudication.

William Rubenstein, *A Transnational Model of Adjudication,* 89 Geo. L.J. 371, 436 (2001). The circuit court stated that the fairness hearing is a tool for the proponents of the settlement to convince the court that the settlement is "fair, adequate, and reasonable." *See Starcher, supra.* Likewise, it is also a vehicle by which class members can object to the proposed settlement.

[11]Attorney McQuade appealed the circuit court's final order approving the settlement to this Court on February 20, 2013, on behalf of Jane Murdock, Nel Cox, and Patricia Holstein. That appeal was docketed as *Jane Murdock, et. al. v. Zina Bibb, et. al.,* No. 13-0194. On April 1, 2013, Monsanto moved to dismiss the appeal for lack of jurisdiction, arguing that there was no evidence that the three petitioners were parties to the underlying action, and if they were parties, their appeal would be subsumed by the present appeal filed by Mr. Urban. We granted Monsanto's motion and dismissed Attorney McQuade's appeal by order entered on June 12, 2013.

In reaching its decision as to whether the settlement was fair, adequate, and reasonable, the circuit court first weighed the evidence in light of nine factors[12]: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; (4) the experience of counsel in the area of class action litigation; (5) the relative strength of the plaintiff's case on the merits; (6) the existence of any difficulties of proof or strong defenses the plaintiffs would likely encounter if the case would go to trial; (7) the anticipated duration and expense of additional litigation; (8) the solvency of the defendants and the likelihood of recovering on a litigated judgment; and (9) the degree of opposition to the settlement. In addition, the circuit court examined five additional factors it deemed unique to this case: (1) the historical success of medical monitoring actions in West Virginia; (2) the historical success of actions against Monsanto on claims arising from its 2,4,5-T operation; (3) the public interest; (4) ease of claims processing; and (5) government involvement.

In applying the factors listed above, the circuit court found that when the parties reached the proposed settlement, the case had been vigorously litigated for over seven years; that the parties had engaged in extensive discovery, with the court even concluding that "[a]nything that was knowable was known;" that despite Mr. Urban's assertion that the settlement was the result of collusion, the negotiations represented nothing more than the normal "give and take" that occurs in negotiation; that Class Counsel has great experience in handling class actions and complex litigation; that over time, Class Counsel determined that there were conflicts between his original theory of the case and the experts' opinions as to the breadth of dioxin exposure; that Monsanto was well-prepared to dispute the class members' evidence; that the trial could have lasted four to six months; that more important than Monsanto's solvency was, absent the settlement, whether class members would live to see a favorable conclusion; that Mr. Urban's claim to represent 1,600 objecting class members was inflated, and that he could establish representation of only twenty-six objectors, who were part of the forty-four individual objections considered; that with the exception of *Perrine*, plaintiffs in this State have not been very successful in medical monitoring cases at trial or on appeal; that prior claims against Monsanto for its 2,4,5-T production have been uniformly unsuccessful; that the public interest favored resolution of the case; that the court was very satisfied with Attorney Flaherty's plan to administer the settlement; and finally, that the government entities contacted by plaintiffs had declined to direct any remediation in the Class Affected Area, other than at the Monsanto site itself.

After weighing the arguments of the proponents of and objectors to the settlement in light of the above factors, the court found the settlement to be fair, adequate, and reasonable, overruled all objections to the settlement, dismissed all claims of the plaintiff classes, and released Monsanto from any and all liability associated with the litigation. The court entered its order approving the settlement on January 25, 2013. From this order, petitioners appeal to this Court.

---

[12]To establish the factors for its analysis, the circuit court looked primarily to the decisions of the Honorable Joseph R. Goodwin in *Groves v. Roy G. Hildreth and Son, Inc.,* 2011 WL 4382708 at 4-5 (S.D. W.Va. 2011) and the Honorable Thomas A. Bedell, 15th Judicial Circuit of West Virginia, in *Perrine, et al. v. E.I. du Pont de Nemours and Company, Final Order Approving Settlement,* January 4, 2011 at 10-11 (dkt. No. 04-C-296-2).

6

## Standard of Review

Circuit court decisions related to class certification are reviewed under an abuse of discretion standard. Syl. Pt. 1, *In re: West Virginia Rezulin Litigation,* 214 W.Va. 52, 585 S.E.2d 52 (2003). With respect to the review of a lower court's approval of a class action settlement, the United States Supreme Court has stated that it "rel[ies] primarily on the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in the light of all the relevant circumstances." *Evans v. Jeff D.,* 475 U.S. 717, 742 (1986); *See also In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 299 (3rd Cir. 1998) (applying an abuse of discretion standard in review of a proposed class action settlement.) However, a circuit court's interpretation of the West Virginia Rules of Civil Procedure presents a question of law and is reviewed de novo. Syl. Pt. 4, *Keesecker v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997). Under the unique circumstances presented in this case, unless otherwise noted herein, we will review the circuit court's decision to approve the settlement under an abuse of discretion standard.[13]

## Discussion

On appeal, petitioners raise ten assignments of error.[14] First, petitioners argue that the circuit court erred by refusing to conduct a hearing when it vacated the decertification of the property class on January 25, 2012. Petitioners rely on the United States Supreme Court's decision in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997), for the proposition that the circuit court must hold a hearing under Rule 23 of the West Virginia Rules of Civil Procedure[15]

---

[13]We note that petitioners couch each of their assignments of error as pure questions of law, or mixed questions of law and fact, and therefore, seek complete de novo review. With the exception of their first and second assignments of error, we disagree with petitioner and believe that the actual issue presented is whether the circuit court erred in finding the settlement to be fair, adequate, and reasonable, rather than turning on an interpretation of law. Nevertheless, even if we were to apply a de novo standard of review to all of petitioners' assignments of error, we still see no reversible error in the circuit court's decision.

[14]On July 8, 2013, Monsanto filed a motion to dismiss four of petitioners' ten assignments of error. Class representatives joined in Monsanto's motion. Specifically, Monsanto argues that with respect to the third and fourth assignments of error, petitioners can show no actual injury, and therefore, lack standing to raise the arguments therein. With respect to petitioners' ninth and tenth assignments of error, Monsanto argues that the assigned errors rely on conjectural or hypothetical injuries, and therefore, petitioners lack standing to raise those arguments as well. Because we affirm the circuit court's decision to approve the settlement as fair, adequate, and reasonable, and because we see no merit in petitioners' four assignments of error challenged by Monsanto on standing principles, we find it unnecessary to address Monsanto's motion to dismiss.

[15]Petitioners acknowledge that *Amchem* involved the federal Rule 23, but state that our State version of Rule 23 was nearly identical at the time of the decision.

anytime there is a change in the class's certification, even if the lower court vacates a prior decertification or creates a "settlement-only" class. Similarly, in their second assignment of error, petitioners argue that the circuit court erred by refusing to allow members of the property class to opt-out of the class when it vacated the decertification of that class, erroneously finding the request to be for a second opportunity to opt-out.[16] Additionally, petitioners allege these two errors violated their right to due process.

We address these two assignments of error together and apply a de novo standard of review because they present questions of law. *See Keesecker, supra.* To begin, we believe the reason for the decertification of the property class to be important to our analysis. The record amply demonstrates that the circuit court decertified the property class based on the exclusion of class representatives' expert's opinions, which rendered it impossible for the property class to prove damages. Contrary to petitioners' assertion, the court did not decertify the class because the prerequisites for class certification under Rule 23 had changed. Simply put, the decertification was based on the merits of the class's claim, not prerequisites for certification under Rule 23.

With the above in mind, under the facts of this case, we find that a second Rule 23 hearing was not required where the court vacated the prior class decertification. In *Amchem,* the parties presented a pre-litigation settlement for court approval and requested class certification simultaneously for the first time. Settlement-only classes usually come to the court without any adversarial process and little to no discovery, therefore the courts must approve the settlement and certify the class at the same time. Such is not the case here. The decertification of the property class was vacated after years of litigation, discovery, and multiple hearings related to the certification. *Amchem* simply does not call for the conclusion petitioners seek under the facts presented in this case.

With respect to the circuit court's refusal to grant petitioners an opportunity to opt-out of the property class after the decertification was vacated, petitioners' argument is based on a false premise, that is, that the vacatur of the decertification created a new class that never existed. Given the vacatur, the decertification essentially never happened. We fail to see how the class changed after the vacatur. Additionally, all class certification orders are essentially tentative and subject to modification before a decision on the merits. *See* W.Va. R. Civ. P. 23(c)(1).

Finally, as to petitioners' assertion that their due process rights were violated by the court's failure to conduct a hearing after vacating the decertification and its refusal to allow a second opt-out opportunity, the record shows that Mr. Urban appeared at the original certification hearings and did not opt-out petitioners. Moreover, the property class definition has always stayed the same and never promised any class member relief. Petitioners simply object to the settlement terms, and that is not grounds for a second opt-out of the class. Finally, we find that petitioners' due process rights were adequately protected by the notice and opportunity to object at the fairness hearing, and petitioners did so in this case. Therefore, we see no error in the

---

[16]Petitioners concede that whether to allow a second opportunity to opt-out is within the circuit court's discretion.

court (1) refusing another certification hearing after vacating the decertification of the property class, or (2) refusing petitioners' request for a second opt-out of the property class.

In their third and fourth assignments of error, petitioners challenge the medical monitoring and property class settlements, respectively, by arguing that the settlements provide benefits for only a small fraction of class members. Specifically, petitioners contend that the medical monitoring class settlement provides benefits for only approximately 5,000 class members out of more than 80,000 alleged class members.[17] Petitioners contend that the property class settlement provides clean-up benefits to less than forty percent of the residences included in the class. Petitioners allege that every class member forever gives up their right to sue Monsanto while receiving no benefit from the settlement. To petitioners, the settlement creates two sub-classes: one that will receive benefits and one that will not. Therefore, to petitioners, it follows that Class Counsel could not adequately represent the interests of both the class who will benefit and the class who will not, the settlement should be struck pursuant to *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), *Amchem, supra,* and *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d. 170 (3rd Cir. 2012) (fundamental conflict of interest within a class is basis for reversal of class settlement approval).

We address petitioners' third and fourth assignments of error together and find no merit in petitioners' arguments therein. Petitioners conflate the singular requirement in Rule 23(a)(4)[18] of "adequate representation" for class certification with the multiple factors to be considered in determining if a settlement is "fair, adequate, and reasonable" as part of the circuit court's settlement approval process under Rule 23(e).[19] Petitioners erroneously contend that a settlement cannot be approved unless *all* class members benefit. Petitioners' argument misunderstands class actions. Class membership entitles just that - membership - but, not necessarily benefits.

With respect to the medical monitoring class settlement, the court determined that the ultimate evidence established that only about 5,000 people had significant exposure to qualify for benefits under Syllabus Point 3 of *Bower v. Westinghouse,* 206 W.Va. 133, 522 S.E.2d 424 (1999), which states:

> In order to sustain a claim for medical monitoring expenses under West Virginia law, the plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the

---

[17]We presume petitioners refer to the fact that the settlement provides benefits to an area subsumed within the larger Class Affected Area.

[18]Rule 23(a)(4) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if . . . (4) the representative parties will fairly and adequately protect the interests of the class."

[19]Rule 23(e) states "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.

There is no fundamental conflict among the medical monitoring class members as they all asserted the same factual predicate, all sought to prove the same evidence of liability against Monsanto, all sought the same relief, and all relied on the same evidence in the case. The only difference between class members who qualify for medical monitoring, and those who do not, is that ultimately there was insufficient evidence for some to prove that "as a proximate result of the exposure, [they] suffered an increased risk of contracting a serious latent disease[.]" Syl. Pt. 3, in part, *Bower, supra.*

The analysis is the same with respect to petitioners' fourth assignment of error challenging the property class settlement. There is no fundamental conflict between the class members. The only difference between those who qualify for property remediation, and those who do not, is that the evidence was ultimately insufficient to show an entitlement to relief for those located farther from the Monsanto plant. As the circuit court found, the final settlement area (subsumed within the larger Class Affected Area) approximated the area supported by the ultimate evidence in the case.[20]

In sum, we believe the record demonstrates that the settlement is based on objective evidence and was reached only after extensive discovery. The settlement results from zealous, rigorous advocacy by both parties. Therefore, we cannot conclude that the circuit court abused its

---

[20]Specifically, in its order approving the settlements, the circuit court stated the following in overruling petitioners' objection and with respect to the evolution of the evidence:

> [A]ll parties understood that by the time of trial, the number of persons who would actually be eligible for medical monitoring would be fewer as a result of the development of the evidence. The plaintiff's demographic expert concluded that approximately 5,000 people could actually meet all the criteria established by [Class expert] Dr. Sawyer to qualify for [Class expert] Dr. Werntz's medical monitoring program. The same limitation applies to the number of homes that could be subject to cleanup. As the original estimate of the class size was based on an isopleth that was not [ultimately] adopted by the experts as probative . . . the ultimate area actually affected is . . . appreciably smaller than that originally projected by Mr. Auberle on the basis of the flawed estimate of 2,3,7,8-TCDD waste produced and burned. Therefore, the large number of Class members and properties initially projected [to be eligible for medical monitoring and property remediation, respectively,] was not supported by the evidence. This potential development was clearly recognized by the Court and all parties. Further, Class members were fully informed that they might not qualify for benefits, even if the case was won by the plaintiffs at trial. Their recovery, if any, was dependent on the evidence. Therefore, this objection is overruled.

discretion in finding it to be fair, adequate, and reasonable. Accordingly, we reject petitioners' third and fourth assignments of error.

Fifth, petitioners argue that the circuit court erred in permitting Class Counsel to negotiate the settlement of the decertified property class at the same time that Class Counsel was negotiating the settlement for the medical monitoring class that was about to go to trial. Similarly, in their sixth assignment of error, petitioners argue the circuit court erred in permitting Class Counsel to negotiate the settlement of additional payments to certain class members who were also personal injury clients of Class Counsel at the same time that Class Counsel was negotiating the global settlement for the two classes. As both assignments of error make the same allegation – a conflict of interest on the part of Class Counsel – we address them together.

Petitioners assert that the property class should have started over as a new case with new counsel because of the disparity between the two classes at the time of settlement. According to petitioners, the property remediation case was always the better case, until Class Counsel's expert erred, his opinions were struck, and the class was decertified. Then from that point, all attention went to medical monitoring. Also, Class Counsel negotiated with Monsanto to pay certain personal injury plaintiffs a gross sum of $10 million. This payment affected the settlements for the classes. Essentially, petitioners allege that Class Counsel and class representatives could not adequately represent both classes after the decertification. *See Amchem* and *Ortiz, supra.*

We do not agree with petitioners. First, *Amchem* involved an intra-class conflict between those suffering presently from asbestos exposure and those who may suffer exposure effects in the future. The United States Supreme Court struck down the settlement because the interests among class members were too diverse. And, as noted above, the settlement and class certification were presented simultaneously for court approval. Such is not the case with the settlement at issue in the present appeal. Second, petitioners point to no concrete evidence of a conflict of interest or collusion. *See* Franklin D. Cleckley, Robin Jean Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 23 at 598 (4th ed. 2012) ("Any purported conflict or antagonism between the representatives and the class must be real and go to the merits of the case. Mere unsubstantiated potential or speculative conflicts will not suffice . . . .") Petitioners simply draw unsubstantiated conclusions because the ultimate settlement was not as beneficial as they believed it could have been. In its order approving the settlement, the circuit court explained why it directed the parties to pursue a global settlement:

> [The court] strongly believed that there was a substantial likelihood that whatever verdict was reached on the medical monitoring claim could potentially determine the outcome of all other matters between the parties arising from claims involving Monsanto's production of 2,4,5-T, based upon the doctrine of issue preclusion/collateral estoppel. Specifically, the jury's answer to the question of whether the tortious activity of the Defendant significantly exposed the Class to a proven hazardous substance could have a preclusive effect on all of the other cases on the issue of liability.

11

As vague evidence of a conflict of interest, petitioners point to the disparity between Class Counsel's initial valuation of the case and the ultimate settlement. However, in addition to being insufficient to establish a conflict, this argument ignores the evolution of the evidence in the case. It was learned that the significant dioxin contamination within the Class Affected Area was not as extensive as originally suspected. Therefore, it certainly seems likely that Class Counsel's initial settlement demands evidence nothing more than settlement tactic to maximize damages, and his final demand reflected the ultimate evidence. The circuit court recognized this in rejecting petitioners' conflict of interest arguments. The court's rationale for directing the parties to seek a global settlement is logical. Accordingly, for the reasons stated above, we cannot conclude the circuit court abused its discretion in ordering the parties to pursue global settlement in this case.

In their seventh assignment of error, petitioners argue that the circuit court should have ordered that the certified classes be *reduced* in size to include only those who had sufficient exposure to dioxin to qualify for benefits under the settlement. Petitioners did not raise this argument before the circuit court. In fact, petitioners' argument here represents the complete opposite position from what they argued at the fairness hearing and from what they argue in their third and fourth assignments of error discussed above. Petitioners neither explain how they preserved this argument for appeal nor advance any legal authority in support for it. Nevertheless, we do not find that the circuit court abused its discretion in failing to redefine the class definitions to comport with the ultimate evidence in the case. The issue of class certification is distinct from the issue of the settlement merits. Stated another way, the merits of a case play no role in class certification. *See* Syl. Pt. 6, *In re: Rezulin Litigation, supra*.

Petitioners' eighth assignment of error contends that the circuit court erred in denying them discovery related to the parties' mediations that, according to petitioners, would have led to discovery of admissible evidence of collusion between Class Counsel and Monsanto. Petitioners argue that the discovery into the mediations would have established the subtle signs of collusion[21] that are set forth in *In re: Bluetooth Headset Products Liability Litigation,* 654 F.3d 935, 947 (9th Cir. 2011):

> (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," [citations omitted]; (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class," [citations omitted]; and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund. [citations omitted].

By order entered on March 20, 2012, the circuit court granted petitioners limited discovery as to the fairness, adequacy, and reasonableness of the proposed settlement (including

---

[21]In their brief, petitioners contend they demonstrated collusion even without the discovery.

an interrogatory related to the timing of the parties' negotiation of attorney's fees and costs), but denied their attempt to engage in discovery related to the two confidential mediation sessions ordered by the circuit court that were unsuccessful. This Court has repeatedly held:

> A trial court is permitted broad discretion in the control and management of discovery, and it is only for an abuse of discretion amounting to an injustice that we will interfere with the exercise of that discretion. A trial court abuses its discretion when its rulings on discovery motions are clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock our sense of justice and to indicate a lack of careful consideration.

Syl. Pt. 1, *B.F. Specialty Co. v. Charles M. Sledd Co.,* 197 W.Va. 463, 475 S.E.2d 555 (1996). In addition, "[d]iscovery of evidence pertaining to settlement negotiations is appropriate only in rare circumstances." *Hemphill v. San Diego Association of Realtors, Inc.,* 225 F.R.D. 616, 620 (S.D. Cal. 2005). Therefore, the issue for this Court is whether the circuit court abused its discretion by denying petitioners the ability to obtain discovery related to the mediations. Here, we agree with the circuit court in rejecting petitioners' argument that collusion is evidenced by the difference between the opening settlement offer and the final agreement. The circuit court recognized this disparity for what it was – normal give and take during settlement negotiation. Certainly, the evolution of the evidence in the case played a part in the parties' negotiations, and there is nothing about this aspect of the negotiation that creates the "rare circumstance" necessary for intrusion into confidential mediations. Therefore, we do not find that the circuit court abused its discretion in denying petitioners discovery related to the mediations.

In their ninth assignment of error, petitioners argue that the circuit court erred by rejecting Mr. Urban's claim at the fairness hearing that he and his firm represented approximately 1,600 objectors to the settlement. The circuit court found that Mr. Urban submitted a list of 1,600 purported clients, but he admitted that his list may not have been up to date. Mr. Urban claimed that all 1,600 individuals should be considered objectors to the settlement on the basis that he contacted each of them at their last known address, explained the terms of the proposed settlement, and included a provision stating that they could opt-out from the objection by contacting him in writing. Only one individual contacted Mr. Urban, and that was to state his continued objection to the settlement. Mr. Urban then presumably concluded that all 1,600 should be deemed objectors.

However, the circuit court determined that twenty-six of the forty-four individual pro se objectors who objected in writing and/or appeared at the fairness hearing were also on Mr. Urban's list. Therefore, the circuit court found that Mr. Urban represented at least twenty-six objectors, but not the full list of 1,600 individuals he claimed.

It is also important to note that petitioners' argument in their ninth assignment of error asks us to ignore the court-ordered procedure stated in settlement notice that required that objections be made in writing to the court before June 7, 2012. As stated above, only twenty-six individuals on Mr. Urban's list of purported clients followed this procedure. And, consistent with the settlement notice, Mr. Urban himself advised all of his purported clients by letter in May of 2012 that they "must write to the [c]ourt" to object to the settlement. Nevertheless, Mr. Urban sought to object on behalf of all 1,600 individuals, whether they followed the required procedure

or not. *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1024 (9th Cir. 1998) (holding that no statute, rule, or case allows counsel to make a class-wide objection.) Clearly, we cannot find that the circuit court abused its discretion by following the objection procedure set forth in the settlement notice.

Petitioners' final assignment of error challenges the circuit court's failure to strike purported agreements that they allege Class Counsel required several of his experts to sign that prevented these experts from participating in any future actions against Monsanto as a term of the settlement. Petitioners assert these "Confidentiality, Non-use, and Non-disclosure Agreements" violate public policy and are unconscionable. The circuit court rejected petitioners' argument, relying primarily on Syllabus Point 6 of *State ex rel. Ward v. Hill,* 200 W.Va. 270, 489 S.E.2d 24 (1997), which states:

> Absent a formal agreement among defendants in a litigation involving multiple defendants, the circuit court should not generally permit a settling defendant's expert witnesses to testify for the remaining defendants. When a settlement agreement between the settling defendant and the plaintiffs prohibits the continued use of the settling defendant's expert witnesses by the remaining defendants, the circuit court, subject to Rule 26(b)(4)(B) [1988] of the *West Virginia Rules of Civil Procedure,* should honor that agreement by not permitting the remaining defendants to use or present such information in the preparation for or conduct of the trial.

In the present case, the circuit court engaged in a balancing analysis between access to evidence and the preference for settlement, and determined that "parties may include settlement terms restricting access to expert testimony as a condition of their settlement" and that "the silence was bargained for by the parties." Accordingly, we see no abuse of discretion in the circuit court's decision. Moreover, we fail to see how the hypothetical and speculative restriction imposed on petitioners by these agreements renders the settlement unfair, inadequate, or unreasonable. For all of these reasons, we reject petitioners' final assignment of error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** November 22, 2013

**CONCURRED IN BY:**

Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**DISSENTING:**

Chief Justice Brent D. Benjamin

14